IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>SCOTT FRED ORME,<br><br>　　　　　　　Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:04-CR-756 TC |

　　　　Defendant Scott Fred Orme has been indicted on a charge of interstate travel with intent to engage in a sexual act with a minor (18 U.S.C. § 2423(b)).  Dr. Orme has filed a Motion to Suppress Statements and Written "Letter of Apology" that were obtained from him by the investigating officer on November 16, 2000.  He contends that his oral statements and handwritten letter were taken in violation of his right to remain silent as guaranteed by the Fifth Amendment to the United States Constitution and his right to counsel as guaranteed by the Sixth Amendment to the United States Constitution.  Specifically, Dr. Orme contends that he was subjected to custodial interrogation without the warning required by Miranda v. Arizona, 384 U.S. 436 (1966), and, accordingly, the statements, including the handwritten letter of apology, must be suppressed.  The court agrees and GRANTS Dr. Orme's Motion to Suppress Statements and Written "Letter of Apology."

　　　　Dr. Orme also filed a Motion in Limine to Exclude E-Mail Evidence for Insufficient Chain of Custody.  For the reasons set forth at the close of the October 20, 2005 hearing, the

court DENIES the Motion in Limine WITHOUT PREJUDICE.

## FINDINGS OF FACT[1]

In October 2000, Stacey Braley-Marshall was working as a detective for the City of West Jordan. At that time, she had four years of experience as a detective and was in charge of investigating sex offenses and crimes committed against children in that jurisdiction.

In late October 2000, she received a complaint made by Mrs. Kristy Huber on behalf of Mrs. Huber's then-minor-child Heidi Huber. Mrs. Huber filed a complaint against Dr. Orme regarding e-mail communications between him and Heidi and the relationship that had developed.

Dr. Orme met Heidi when he was a school psychologist at an elementary school where Heidi was a student. When Heidi later attended Joel P. Jensen middle school, Dr. Orme worked as the school psychologist there. Detective Braley-Marshall knew Dr. Orme professionally, as they would occasionally communicate about cases involving students at the middle school.

Detective Braley-Marshall investigated the claim by interviewing Heidi on videotape, interviewing Heidi's mother, reviewing printouts of the alleged e-mail correspondence, and reviewing Heidi's diary. Detective Braley-Marshall also advised Mrs. Huber that Mrs. Huber could pose as Heidi and correspond with Dr. Orme through e-mail.

On November 16, 2000, following Detective Braley-Marshall's investigation, she and another officer went to Dr. Orme's house to arrest him. Dr. Orme answered the door. Detective Braley-Marshall and the other officer handcuffed Dr. Orme and drove him, in an unmarked

---

[1] All facts are taken from the testimony and exhibits presented at the June 27, 2005 evidentiary hearing on Dr. Orme's Motion to Suppress.

police car, to the West Jordan police station. Dr. Orme was not given a <u>Miranda</u> warning then or at any time before he gave any oral or written statement to the officers.

After they arrived at the station, Detective Braley-Marshall took Dr. Orme into her office with the intent to question him and closed the door. No one else was present. The detective claimed during her testimony that she did not ask Dr. Orme any questions, but she did admit that she began relating the details of her investigation to Dr. Orme (although she could not remember how much of the details she had told Dr. Orme). She did agree during her testimony that the verbal statements Dr. Orme made to her were clearly in response to the allegations she had related to him and that Dr. Orme became emotionally upset upon hearing them. She also asked Dr. Orme whether he wanted to write a letter of apology. She admitted that, under the circumstances at that time, she knew that the letter of apology could be used as evidence against Dr. Orme. The following is an excerpt from Detective Braley-Marshall's testimony:

> Q – How did the interview start?
>
> A I set him down and I just advised him of what was – what – the allegations made.
>
> Q And what was his response?
>
> A I believe he put his – I remember him putting his head into his hands. He became emotionally upset. Felt like that he had crossed the line with Heidi. And felt like – he'd even made the comment that it wasn't Heidi really making the E-mail communication but he hadn't been sure.
>
> Q Did you ask him if he wanted to write an apology letter?
>
> A I did.
>
> The Court:   But no Mirandas yet had been given; right?
>
> THE WITNESS:   No. I had not asked any questions.

3

>        . . .
>
> Q    After he wrote the letter, what happened with it?
>
> A    It should have gone into the case file and then eventually into the evidence.

(Transcript of the June 27, 2005 Evidentiary Hearing on Motion to Suppress ("Tr.") at 11-12; see also Tr. at 14 ("Q: And you then started in talking to him about the details of your investigation, didn't you? A: I did give him some details, yes."); Tr. at 15 ("Q: You're talking to him about the investigation, you give him some information about some of it; correct? A: Yes. Yes."); Tr. at 15-16 ("Q: and it is after you conveyed this information, and after you tell him the details of your investigation, that he makes these statements that you referenced in your answer to [questions from the prosecutor]; is that correct? A: That's correct."); Tr. at 17-18 ("Q: So Dr. Orme is alone with you in your office with the door closed? A: Yes. Q: Under circumstances where you're questioning him about this offense; correct? A: Was going to question, yes."); Tr. at 18 ("Q: Would you have told Dr. [Orme] at that point in time, detective, that Heidi Huber's mother, Kristy Huber, had been impersonating Heidi as part of the E-mail dialogue or the E-mail exchange that's at issue in this [case]? A: I could have, yes.").)

Dr. Orme ultimately wrote a letter of apology (Pl.'s Ex. 9) and made verbal statements to Detective Braley-Marshall. This is the evidence he now seeks to have suppressed.

The government conceded during final argument that the letter of apology was inadmissible and so must be suppressed. The court need only address the admissibility of Dr. Orme's verbal statements to Detective Braley-Marshall by determining whether he was subject to custodial interrogation when he made the statements.

## CONCLUSIONS OF LAW

The parties do not dispute that Dr. Orme was never given a Miranda warning. They also do not question the well established legal principle that a Miranda warning is an "absolute prerequisite" to custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 471 (1966). "[T]he prosecution may not use statements . . . stemming from custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444.

Accordingly, the issue here is whether Dr. Orme was subject to custodial interrogation when he made the statements. If he was, then the statements must be suppressed.

**Custodial Interrogation**

In order for Dr. Orme to invoke his right to have statements suppressed absent a Miranda warning, "both a custodial situation and official interrogation are required." United States v. Bautista, 145 F.3d 1140, 1147 (10th Cir. 1998).

**Dr. Orme Was In Custody**.

"The ultimate inquiry in deciding whether a suspect is in custody for purposes of administering Miranda warnings 'is simply whether there is a 'formal arrest or restraint on the freedom of movement' of the degree associated with a formal arrest.'" United States v. Benally, 146 F.3d 1232, 1239 (10th Cir. 1998) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). "If, from an objective viewpoint, someone in [defendant's] position would reasonably believe [his] freedom of action had been curtailed to a 'degree associated with a formal arrest,'

5

then [he] would be held in custody during the interrogation." Id. (citations omitted).

Dr. Orme asserts that he was in custody when he made the statements. (See Def.'s Mem. in Supp. of Mot. to Suppress at 2-4.) The government does not address, much less challenge, this assertion in its opposition brief. (See Mem. in Opp'n to Mot. to Suppress.)

The record is very clear. Dr. Orme had been arrested, placed in handcuffs, and driven in an unmarked police car to the police station for questioning. He was placed in a room at the police station with the door closed. The only individuals present were Dr. Orme and the detective. This was a police-dominated atmosphere. See, e.g., United States v. Griffin, 7 F.3d 1512, 1518-19 (10th Cir. 1993) ("When police are in full control of the questioning environment, custody is more easily found."); see also United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000) (a person is in custody when his "'freedom of action is curtailed to a degree associated with formal arrest'"). The court agrees that Dr. Orme was in custody at the time he made the verbal statements to Detective Braley-Marshall.

**Dr. Orme was Interrogated by Detective Braley-Marshall.**

To rely on the protections of Miranda, Dr. Orme must show that custodial interrogation was "imminent or presently occurring" at the time he made the statements. United States v. Rambo, 365 F.3d 906, 909 (10th Cir. 2004). The United States Supreme Court defined "interrogation" in Rhode Island v. Innis, 446 U.S. 291 (1980). "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301 (emphasis

6

added).  The test of whether police questioning or actions constitute "interrogation" is an objective one.  Rambo, 365 F.3d at 909.

The government contends that Detective Braley-Marshall never "questioned" Dr. Orme and so no interrogation occurred.  Instead, the government argues, Dr. Orme spontaneously blurted out his statements after a "simple recitation by the police of mere allegations against him," an action normally attendant to arrest and custody.  (See Govt.'s Opp'n Mem. at 4.)  The court disagrees.[2]  Given the totality of the circumstances presented in the record, including the witnesses's testimony and nature and contents of the apology letter (Pl.'s Ex. 9), the court concludes that Detective Braley-Marshall's statements to Dr. Orme about the details of her investigation went beyond a mere recitation of allegations or words "normally attendant to arrest and custody."

First, as noted above, interrogation may occur even if the officer does not expressly question the suspect.  See Innis, 446 U.S. at 301.  Given such a standard, the government's argument that Detective Braley-Marshall never actually questioned Dr. Orme fails.  Whether the detective's conversation with Dr. Orme was void of questions is beside the point.  The pertinent inquiry is whether Detective Braley-Marshall's statements to Dr. Orme regarding the complaint against him and regarding the results of her investigation amounted to words or actions that the

---

[2]The government asserts that Dr. Orme "was not in an inherently coercive environment.  His inculpatory statement was made freely and voluntarily, to an old fellow professional." (Govt.'s Opp'n Mem. at 4.)  The court does not find this characterization of the encounter between Detective Braley-Marshall and Dr. Orme persuasive.  Dr. Orme had been arrested, handcuffed, taken to the police station, and placed in a room with a police detective, albeit a person with whom he was somewhat familiar.  This was not a situation where "old fellow professionals" were having a casual conversation.

Detective should have known were reasonably likely to elicit an incriminating response by Dr. Orme.

The record belies the government's interpretation of the events that transpired on the evening of November 16, 2000. Detective Braley-Marshall admitted that she specifically took Dr. Orme to the police station and placed him in the room with the intent to question him.[3] She confronted Dr. Orme with allegations of the underlying crime and related details of her investigation to him, including the fact that Heidi Huber's mother had impersonated Heidi in certain e-mails sent to Dr. Orme. (See Tr. at 11-12, 14-18.) Such detail goes beyond the "simple recitation" of allegations. That kind of detail is not needed to inform a suspect as to why he is being taken into custody. And it was in response to the detective's statements that Dr. Orme became emotionally upset and made any statements. Further, Detective Braley-Marshall's suggestion that Dr. Orme write a letter of apology bolsters Dr. Orme's position that Detective Braley-Marshall's discussion went beyond mere recitation of allegations. See United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (suggesting that a plea to the suspect's conscience might constitute interrogation).

The Tenth Circuit has recognized that certain routine police techniques, such as "positing the guilt" of the suspect, fall within the definition of "interrogation." See Rambo, 365 F.3d at 909-10; see also United States v. Orso, 266 F.3d 1030, 1033-34 (9th Cir. 2001) (finding that detective's discussion with suspect regarding evidence against the suspect was functional equivalent of interrogation). The court finds that the detective posited the guilt of Dr. Orme and

---

[3] The court notes that the need for Miranda protections arises not just when interrogation is occurring but when it is imminent. Rambo, 365 F.3d at 909.

effectively interrogated Dr. Orme for purposes of the court's Miranda analysis. The detective's statements were reasonably likely to elicit an incriminating response from Dr. Orme.

Furthermore, the detective's actions and words were not those "normally attendant to arrest and custody." Innis, 446 U.S. at 301. The Tenth Circuit has only found conduct "normally attendant to arrest and custody" in rather limited and benign circumstances, none of which can be compared to the events that occurred in this case. See, e.g., Fox v. Ward, 200 F.3d 1286, 1298 (10th Cir. 2000) (holding that officers' action of handing business cards to suspect in custody and introducing themselves was not interrogation or its functional equivalent because it was "normally attendant to arrest and custody"); United States v. Roman-Zarate, 115 F.3d 778, 782 (10th Cir. 1997) (holding that federal agent's question, posed to other agents to determine whether the defendant had invoked his right to counsel, did not constitute interrogation because it was "quite consistent with conduct attendant to arrest and custody"); United States v. Comosona, 848 F.2d 1110, 1112-13 (holding that federal agent did not interrogate defendant in custody simply because the agent handed the defendant a business card and invited him to call the agent collect to discuss the incident under investigation).

Because Dr. Orme was subject to custodial interrogation without being told of his Miranda rights, Dr. Orme's verbal statements to Detective Braley-Marshall must be suppressed.

**ORDER**

For the foregoing reasons, Defendant Scott Fred Orme's Motion to Suppress Statements and Written "Letter of Apology" is GRANTED. For the reasons set forth at the close of the October 20, 2005 hearing, Dr. Orme's Motion in Limine to Exclude E-Mail Evidence for

9

Insufficient Chain of Custody is DENIED WITHOUT PREJUDICE. Dr. Orme may re-file his Motion in Limine at the time of trial.

DATED this 7th day of November, 2005.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge